# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　Plaintiff,<br>v.<br>MAURICE HOLMES,<br>　　　　　Defendant. | Case No.: 2:21-cr-00225-GMN-NJK<br>**REPORT AND RECOMMENDATION**<br>[Docket No. 46] |

　　　This matter was referred to the undersigned Magistrate Judge on Defendant's motion to suppress evidence. Docket No. 46. The Court has considered Defendant's motion, the United States' response, Defendant's reply, and the evidence and arguments presented at an evidentiary hearing held before the Court. Docket Nos. 46, 47, 50, 53.

**I.　　BACKGROUND**

　　**A. Testimony of Officer Norberto Moreno-Marquez.[1]**

　　　On March 9, 2021, Las Vegas Metropolitan Police Department ("LVMPD") Officer Norberto Moreno-Marquez was on duty with Officer Ryan Michaels. Officers Moreno-Marquez and Michaels were both in uniform and patrolling in a marked vehicle. Docket No. 57 at 8-9. At approximately 1:56 p.m., the officers were dispatched to a possible auto burglary incident on Stewart Avenue between N. 21st Street and N. 23rd Street in Las Vegas, Nevada. *Id.* at 9-11; Government Exh. 1 at 1. Dispatch also assigned one other LVMPD vehicle with two officers to

---

[1] Although Detective Moreno-Marquez is now a detective, he was an officer at the time of the events at issue here. Docket No. 57 at 7-8. Accordingly, the Court refers to him as "Officer," rather than "Detective."

respond to the incident. Docket No. 78 at 11-12. Dispatch indicated that the suspects were Black male adults but provided the officers no other physical descriptors. *Id.* at 35-36.

Officer Moreno-Marquez and Officer Michaels immediately drove to the scene and approached the address, driving down Stewart Avenue towards N. 23rd Street. Docket No. 57 at 16. *See also* Government Exhs. 6, 6A. Officer Moreno-Marquez knew that the area was a high crime area where criminal street gangs operated. Docket No. 57 at 14. As a result, he was looking around the area as the officers approached, in case there were fleeing subjects. *Id.* at 15. As the officers' vehicle approached the scene, Officer Moreno-Marquez observed Defendant, a Black male adult, running toward Stewart Avenue through an alleyway between two apartments into a fenced area. *Id.* at 16; *see also* Government Exhs. 6A, 7A. Officer Moreno-Marquez saw Defendant running at full speed toward Stewart Avenue until he noticed the two officers, at which point he came to a "complete walking stop." Docket No. 57 at 34. Officer Moreno-Marquez was suspicious that Defendant was the only individual in the area running and that he suddenly changed his gait when he saw the officers. *Id.* at 34. At that time, Officer Moreno-Marquez was unaware if the other LVMPD officers had arrived at the scene yet. *Id.* at 15. He believed Defendant was running away from the scene to which he and the other officers were responding. *Id.* at 19.

Officer Moreno-Marquez told Officer Michaels to stop the vehicle and both officers got out of the car. *Id.*[2] Officer Michaels drew his weapon and gave verbal commands to Defendant. *Id.* at 19, 38-39. Officer Moreno-Marquez jumped over the fence surrounding the building and apprehended Defendant near the fence, verbally commanding him to lay on the ground. Docket No. 57 at 18-19, 38-39. *See also* Government Exhs. 7, 7A. After Officer Moreno-Marquez apprehended Defendant, he and Officer Michaels conducted a weapons frisk of him, and found no weapons on his body. Docket No. 57 at 34. Officer Moreno-Marquez then went to meet with LVMPD Officers Kevin Rivera and Timothy Morey, who had approached the scene from another

---

[2] Body camera footage depicts this interaction, from the initial stop of the LVMPD vehicle to the apprehension and weapons frisk of Defendant. *See* Government Exh. 2 at 7:10-8:04. Officer Moreno-Marquez's testimony closely aligns with what the body camera footage represents, such that the Court finds that separate discussion of this segment of the body camera footage is unnecessary.

2

direction before Officers Moreno-Marquez and Michaels had arrived. *Id.* at 23, 39. Officer Moreno-Marquez also walked around the scene to check whether any additional subjects had hidden or fled as officers approached the scene. *Id.* at 23. Officer Moreno-Marquez had previous experience with one of the apartments in the area and, as a result, believed that an initial safety check was necessary to make sure no other suspect was hiding. *Id.* At this time, Officer Michaels took Defendant back down the alley to where the other officers were located, as well as the two additional subjects that Officers Rivera and Morey had detained. *Id.*

Officer Moreno-Marquez had a brief conversation with Defendant after bringing him to the other LVMPD vehicle. *Id.* Defendant told Officer Moreno-Marquez that he was not a resident of the area and that he was "on paper," meaning he was either on parole or probation. *Id.* at 23-24. After learning this information, Officer Michaels and Officer Moreno-Marquez investigated whether Defendant was on supervision. *Id.* at 25. Officer Michaels radioed the LVMPD warrants channel. *Id.* at 26. Based on the information provided to Officer Michaels, Officer Moreno-Marquez arrested Defendant for violation of his parole. *Id.*

After Officer Moreno-Marquez arrested Defendant and the scene was secured, he rewalked the alleyway where he had observed Defendant fleeing, which is his practice. *Id.* at 27. He takes this action to locate both abandoned contraband and any other items of evidence that can help identify the suspect, and does so for community safety, regardless of whether the fleeing subject is successfully apprehended by the officers. *Id.*

While walking down the alleyway, Officer Moreno-Marquez observed a firearm on the ground among flowers and dirt. *Id.* at 27-28, 32-33. *See also* Government Exhs. 2A at 6:53-6:59, 4, 5. The firearm was a tan Glock 19x model with an extended magazine. Defense Exh. A at 3. Officer Moreno-Marquez believed that the weapon appeared to be "fairly new" and "very clean" which, given the location in which it was observed, indicated that it had been recently abandoned or discarded. Docket No. 57 at 29-30. Once Officer Moreno-Marquez observed the firearm, he froze the premise and requested both a crime scene analyst and a detective from the Downtown Area Command to safely recover the firearm. *Id.* at 30, 32-33. *See also* Government Exh. 2A at 7:01-15-20.

3

After radioing for additional law enforcement assistance and entering the information about the firearm into his vehicle's system, Officer Moreno-Marquez returned to Defendant and read him *Miranda* warnings. Docket No. 57 at 30; Government Exh. 2A at 15:46-16:13. Officer Moreno-Marquez then asked Defendant questions about his criminal history, told Defendant that a firearm had been located, and asked him whether the firearm was his. Docket No. 57 at 30, 33; Government Exh. 2A at 16:30-17:09.

Defendant vehemently denied ownership of the firearm seven times. Docket No. 57 at 30, 33; Government Exh. 2A at 17:08 – 18:10.[3] Defendant was arrested at the scene for violation of parole. Docket No. 57 at 26.

### B. Testimony of Officer Timothy Morey

On March 9, 2021, Officer Timothy Morey was on duty as a LVMPD officer. Docket No. 57 at 44-45. At around 2:00 p.m. that day, he was called out to Stewart Avenue near 23rd Street to respond to a possible auto burglary in the north alley of the address provided during the 911 call. *Id.* at 45-46. The call was high priority because the incident was ongoing. *Id.* at 46. Officer Morey was in uniform and a marked patrol vehicle alongside LVMPD Officer Rivera. *Id.*

While the officers were on their way to the scene of the incident, Dispatch told them that there was "a group of Black male adults, checking door handles" of vehicles in a north alley of the property. *Id.* at 46-47. Dispatch further stated that the person reporting had a previous incident with these Black male adults that were in the alley and that, during that previous incident, rocks were thrown at the person reporting. *Id.* at 47. Officer Morey was not provided descriptions of the males' clothing or heights. *Id.* at 59. He was told that they were slim Black male adults. *Id.*

Officer Morey approached the north alley from N. 23rd Street and made an eastbound turn into the alley, approaching the target location. *Id.* at 47. Officer Morey observed two Black males when he arrived in the alley in a location consistent with where the 911 caller indicated he had

---

[3] Officer Moreno-Marquez's body camera footage from the incident includes both video and audio of this interaction. Government Exh. 2B at 17:08-18:10. Defendant unequivocally stated that he was not the owner of the firearm and that he was "100% sure" and "positive" that his DNA would not be located on it. *Id.* (Defendant's exact responses to the questions were: "hell no," "no," "100% sure," "that's not my firearm," "I'm positive," "it is not my firearm, sir," and "swab me, whatever, right now.").

4

observed the group. *Id*. at 47-48.  One of the males was wearing a red shirt and the other male was wearing a black hooded sweater. *Id.* at 48; *see also* Government Exh. 3.  Upon arriving at the scene, the officers stepped out of the car to make contact with the two Black males. Docket No. 57 at 48.  They did not draw their on-duty weapons at any point during their investigation of this incident. *Id.* at 63.  Officer Morey asked the two males to step to the front of his patrol vehicle. *Id.* at 48-49.  He interacted with the male in the red shirt while Officer Rivera interacted with the male in the black sweater. *Id.* at 49.

At the time of this initial interaction, Officer Morey was not aware of a third individual who might have been involved in the incident. *Id.* at 49.  While the officers were talking with the two males in the alley, Officer Morey heard loud yelling to the south toward Stewart Avenue, which sounded like verbal commends that LVMPD officers would issue. *Id.*  He later became aware that a third individual was involved in the incident when Officers Moreno-Marquez and Michaels brought Defendant to the front of his patrol car. *Id.*

Officer Morey later reviewed his body camera footage from his approach to the scene and, although he did not remember seeing a third individual while the vehicle entered the alley, his camera footage depicts a Black male wearing white clothing standing next to the two individuals with whom he and Officer Rivera interacted. *Id.* at 50-55.  This individual was no longer present on the scene when Officer Morey exited his vehicle, but the images from his body cam footage match Defendant. *Id*.  Officer Morey never issued any commands to Defendant and never spoke to him. *Id.* at 55-56.

The person who called 911 to report the auto burglary was on the scene when Officer Morey arrived and spoke with him. *Id.* at 56-57.  This individual provided his name and contact information, which is contained in the CAD. *Id.*; *see also* Government Exh. 1 at 1.  Officer Morey reviewed the video that the 911 caller had watched while making his call to the police and made a determination that there was no evidence of an auto burglary. *Id.* at 59.  Officers could not determine whether an auto burglary was in progress before arriving at the scene of the incident and securing the scene. *Id.* at 59-61.  After it was determined that no auto burglary was in progress,

Officer Morey and Officer Rivera took information from the individuals in the red shirt and the black sweater and released them. *Id.* at 62.

## II. ANALYSIS

### A. Credibility of Witnesses

The Court ordered an evidentiary hearing in order to make an accurate determination of what occurred in the instant case and how the facts relate to the applicable caselaw. "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes. Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012). "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted). *See also United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility. Having done so, the Court finds that both witnesses testified credibly.

### B. Motion to Suppress

Defendant asks the Court to suppress the firearm recovered on March 9, 2021. Docket No. 46. Defendant submits that, on the date of his arrest, the officers pursuing him had no reasonable suspicion to stop and seize him at gunpoint, because the 911 call did not give particularized descriptions of the men who were observed through a video call, the informant who made the call was unreliable, the 911 call did not report an emergency, and Defendant's presence in the area in running clothing was not sufficient to establish reasonable suspicion. *Id.* at 2-7. Defendant

submits that, although he fled from the officers, flight does not *per se* establish reasonable suspicion. *Id.* at 6-7. Because no reasonable suspicion exists, Defendant submits that his stop and seizure by the LVMPD officers violated the Fourth Amendment. *Id.* Defendant further submits that the officers would not have searched his travel path and located the firearm but for his unconstitutional stop and seizure. *Id.* at 7. Defendant therefore asks the Court to suppress the firearm as fruit of the poisonous tree that stemmed from the Fourth Amendment violations he endured. *Id.*

In response, the United States asks the Court to deny Defendant's motion. Docket No. 47. The United States submits that Defendant has no standing to seek suppression of the firearm since he willfully abandoned it before the officers stopped and seized him by discarding the firearm under a flower bush in a stranger's yard and running away from it. *Id.* at 4-7. Since the firearm was abandoned, the United States submits, Defendant had no reasonable expectation of privacy in it, and thus no standing to seek its suppression. *Id.* at 7. The United States further submits that the officers had reasonable suspicion to detain Defendant, as they were responding to a 911 call detailing an in-progress burglary of a car, the informant was reliable, the information he provided gave physical descriptions of the individuals present at the scene and the number of people that was consistent with the group of individuals observed at the scene, and Defendant immediately fled without provocation when police arrived at the scene. *Id.* at 8-10. Since the stop was reasonable under the circumstances, the United States submits, it did not violate Defendant's Fourth Amendment rights. *Id.* Finally, the United States submits that the firearm was not a fruit of the seizure as it was abandoned before the officers ever had contact with Defendant. *Id.* at 10-12.

In reply, Defendant submits that he has standing to seek the suppression of the firearm because he was illegally seized before it was located by law enforcement and there is no attenuation between his wrongful detention and the discovery of the firearm. Docket No. 50 at 2-4. Defendant further submits that the officers had no reasonable suspicion to draw weapons on him while effectuating their stop. *Id.* at 5.

. . . .

### 1. Fourth Amendment Standards

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects "people, not places" and their legitimate and reasonable expectations of privacy. *Katz v. United States*, 389 U.S. 347, 350-51 (1967). Reasonableness is the touchstone of the Fourth Amendment. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). If evidence is obtained in violation of the Fourth Amendment, that evidence and evidence derived from it can be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484-87 (1963). *See also United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013).

### 2. Standing

To have Fourth Amendment "standing" to "contest the legality of a search or seizure, the defendant must establish that he had a 'legitimate expectation of privacy' in the place searched or in the property seized." *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir. 1986) (emphasis added) (citation omitted). Defendant has the burden of establishing standing, not the United States. *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (defendant's burden of proof as established by the Supreme Court*); United States v. Hull*, 2022 WL 2921000, at *2 (E.D. Wash. July 25, 2022).

It is well settled that a "defendant who abandons property has no standing to contest its search and seizure." *United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000). *See also United States v. Gilman*, 684 F.2d 616, 619 (9th Cir. 1982) ("[i]f a person has voluntarily abandoned property, he has no standing to complain of its search or seizure"). Whether a defendant abandons property is a question of fact; a court must examine the totality of circumstances, including whether the defendant denied ownership of the property. *United States v. Gonzalez*, 979 F.2d 711, 714 (9th Cir. 1992). Abandonment is determined "by measuring the intent of a party in objective terms." *Gilman*, 684 F.3d at 619. It may "be inferred from words, acts and other objective facts ... (that) the person ... relinquished ... a reasonable expectation of privacy in his property." *United States v.*

*Jackson*, 544 F.2d 407, 409 (9th Cir. 1976); *United States v. Sledge*, 650 F.2d 1075, 1077 (9th Cir. 1981).

Here, the facts clearly establish that Defendant abandoned the firearm before he came into contact with any police officers. Defendant was standing next to two other males when Officers Morey and Rivera arrived on the scene but fled before the officers even noticed him. As he ran, Defendant discarded his firearm. After Defendant discarded the firearm, he was stopped by Officers Moreno-Marquez and Michaels. When Officer Moreno-Marquez questioned Defendant about the firearm, Defendant unequivocally denied its ownership numerous times. Under the totality of the circumstances, the Court finds that Defendant abandoned the firearm and, therefore, he does not have standing to contest its search and seizure.

Even if Defendant did have standing, however, the Court finds that suppression is not warranted.

### 3. Seizure

The Fourth Amendment permits "brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396-97 (2014) (citations and quotations omitted). *See also Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Such investigative stops are considered seizures. *Id.* A seizure occurs when a person, "by means of physical force or a show of authority," has his freedom restrained. *United States v. Smith*, 633 F.3d 889, 892-93 (9th Cir. 2013) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). An application of physical force by law enforcement is always sufficient to effectuate a seizure, but an officer's show of authority only effectuates a seizure when the person to whom it is directed actually submits to the authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). To conduct a brief investigative stop in accordance with the Fourth Amendment, the stop must be based on reasonable suspicion of criminal activity. *Navarette*, 572 U.S. 369-97.

Reasonable suspicion exists when "'specific, articulable facts' which together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000)

(quoting *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989)). *See also United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000). The "quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong*, 224 F.3d 1126, 1140 (9th Cir. 2002) (internal quotations omitted).

Reasonable suspicion "is dependent upon both the content of the information possessed by the police and its degree of reliability." *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) (internal citation omitted); *see also Navarette*, 572 U.S. at 397 (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion can depend on an officer's personal experience and special training to make inferences and deductions, as long as the conclusions are reasonable. *Montero-Camargo*, 208 F.3d at 1131 (internal citations omitted). Reasonable suspicion cannot be based on "broad profiles," "a prefabricated or recycled profile of suspicious behavior," or "overbroad generalizations." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121, 1124, 1126 (9th Cir. 2002) (internal citations omitted). A suspect's unprovoked flight from law enforcement does not *per se* establish reasonable suspicion, but it is considered suggestive of wrongdoing and can contribute to a determination that reasonable suspicion exists. *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). Moreover, officers can consider "the relevant characteristics of a location in determining whether the situation is sufficiently suspicious to warrant further investigation." *Id.* at 124.

Determining reasonable suspicion requires considering the totality of the circumstances, and "all relevant factors must be considered in the reasonable suspicion calculus – even those factors that, in a different context, might be entirely innocuous." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 277-78 (2002)). When considering the totality of the circumstances, courts must remember that reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

Facts and circumstances contributing to reasonable suspicion to conduct a brief investigatory stop can be based on information provided to law enforcement by informants. *Adams v. Williams*, 407 U.S. 143, 146-48 (1972); *see also United States v. Palos-Marquez*, 591 F.3d 1272, 1275 (9th Cir. 2010). Law enforcement can rely on an informant's tips to justify investigatory stops if the tips have indicia of reliability. *Palos-Marquez*, 591 F.3d at 1275. Knowledge of the identity of the informant can add to the reliability of the informant. *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citing *Adams*, 407 U.S. 146-47) and *White*, 496 U.S. at 329). An informant's information is generally considered more reliable if the information reported is being or was observed firsthand. *See Navarette*, 572 U.S. at 399 (citing *Gates*, 426 U.S. at 234).

Here, the Court finds that Defendant was seized by Officers Moreno-Marquez and Michaels when he submitted to their verbal commands to stop and lie on the ground and was handcuffed by Officer Moreno-Marquez. Defendant had fled from the location that Officers Morey and Rivera were approaching in their vehicle. He did not interact with law enforcement personally until Officer Michaels drew his gun and issued verbal commands while Officer Moreno-Marquez jumped the fence and approached him. Defendant, upon seeing Officers Moreno-Marquez and Michaels, immediately responded to the verbal commands and lay down on the ground. He was then handcuffed by Officer Moreno-Marquez and a weapons frisk was conducted.[4]

The Court further finds that, considering the totality of the circumstances, reasonable suspicion supported the investigative stop. Officers Moreno-Marquez and Michaels were responding to the location in question based on information provided by an informant that a potential auto burglary was in progress in the alleyway. The informant's tip contained many indicia of reliability, as the informant provided his identity and contact information, he personally observed the incident through a live video camera stream at the time he reported the information

---

[4] The evidence establishes that Defendant was ultimately arrested following this initial seizure by the officers for violation of his parole. However, until that point, he was stopped for an investigatory stop and neither party submits that he was arrested at the time of this interaction. Therefore, the seizure of his person need only be supported by reasonable suspicion to pass muster under the Fourth Amendment.

11

to the police, he had prior experience with the group he observed where they had thrown rocks at him, and he provided detailed information about the group in terms of their specific location, as well as some general information about their physical appearance.[5] The informant also provided details about the suspected criminal activity, that the men he observed were pulling on car handles and potentially attempting to break into the cars in the alleyway.

Officer Moreno-Marquez, at the time of the incident, had at least five years of experience working for LVMPD doing patrol and field training for the Downtown Command Unit. This included special training in policies and procedures, criminal law, and a period of partnered field training. He also had personal experience working as an officer in the neighborhood the informant described and in responding to incidents at the specific location reported. Based on this experience, he knew the area to be generally considered high crime and one where criminal street gangs sometimes operated. Officer Moreno-Marquez observed Defendant running quickly away from the subject location and slowing his pace rapidly upon noticing the LVMPD patrol car on Stewart Avenue.

Considering the totality of the circumstances, the Court finds that it was reasonable to conclude that a possible auto burglary was in progress and that Defendant, an adult Black male, might have been involved in it and was fleeing the scene. This conclusion is sufficiently particularized and reasonable to establish that reasonable suspicion existed to briefly seize Defendant for an investigative stop. Since the Court finds that the investigative stop was supported by reasonable suspicion, the Court further finds that it was not conducted in violation of the Fourth Amendment. Given that there is no underlying constitutional violation, suppression of any evidence is not warranted under the fruit of the poisonous tree doctrine.

. . . . .

---

[5] The Court is not swayed in its reasonable suspicion analysis by the evidence adduced at the evidentiary hearing that, upon Officer Morey's review of the video the informant watched, he determined that an auto burglary was not occurring. Reasonable suspicion is assessed based on the totality of the circumstances and information available when the police action being challenged occurred. *See Terry*, 392 U.S. at 21-22. Further, the purpose of the investigatory stop is to investigate potential criminal activity. The Supreme Court has recognized that the standards governing investigative stops "accept the risk that officers may stop innocent people" in favor of allowing brief investigations. *Wardlow*, 528 U.S. at 125-26.

### III. RECOMMENDATION

Based on the foregoing and good cause appearing therefore, **IT IS RECOMMENDED** that Defendant's motion to suppress, Docket No. 46, be **DENIED.**

IT IS SO ORDERED.

DATED: August 15, 2022.

_____
NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

### NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation must file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).