UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:21-cr-00225-GMN-NJK |
| vs. | ) | |
| | ) | **ORDER** |
| MAURICE HOLMES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pending before the Court is the Report and Recommendation ("R&R") of United States Magistrate Judge Nancy J. Koppe, (ECF No. 58), counseling that the Court deny Defendant Maurice Holmes's ("Defendant's") Motion to Suppress, (ECF No. 46). The Defendant timely filed an Objection, (ECF No. 64) and the Government timely filed a Response, (ECF No. 65).

For the reasons discussed below, the Court **ADOPTS** the Report and Recommendation and **DENIES** the Motion to Suppress.

**I.    BACKGROUND**

On August 11, 2021, an Indictment was entered charging Defendant with one count of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of Illegal Possession of a Machine Gun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). (*See* Indictment, ECF No. 1). The Indictment issued following Defendant's arrest during an encounter between Defendant and the Las Vegas Metro Police Department ("LVMPD"). The specific facts underlying the encounter are outlined below.

On March 9, 2021, at approximately 1:56 p.m., Officer Norberto Moreno-Marquez ("Officer Moreno-Marquez") and Officer Ryan Michaels ("Officer Michaels") were dispatched to a possible auto-burglary incident on Stewart Avenue between N. 21st Street and N. 23rd

Street in Las Vegas, Nevada in response to an emergency 911 call.[1] (R&R 1:19–23, ECF No. 58). The 911 caller reported that while watching his home video camera system, he saw a group of Black male adults pulling on car door handles and attempting to break into cars in the north alley on 23rd street. (Evidentiary Hr'g Tr. 36:13–17 47:16–20, ECF No. 57). Officer Timothy Morey ("Officer Morey") would later confirm that suspects were in the north alley per the caller's tip. (*Id*. 48:1–11, 61:14–17). The 911 caller further disclosed that he had a previous encounter with the same group of Black male adults in which they threw rocks at him. (*Id*. 47:4–7). The 911 caller provided no physical descriptor for the Black male adults, other than that they were slim.[2] (*Id*. 50:11–12). The 911 caller provided his name and contact information to officers and would later meet with officers in person at the scene. (R&R 5:21–23); (Evidentiary Hr'g Tr. 36:9–12).

As Officer Moreno-Marquez and Officer Michaels approached the scene, they observed Defendant, a Black male, running away from the scene of the alleged auto-burglary and toward Stewart Avenue through an alleyway between two apartments into a fenced area. (*Id*. 2:6–10). According to Officer Moreno-Marquez, upon noticing the officers, Defendant immediately slowed his gait until he came to a "complete walking stop." (*Id*. 2:11–14); (Evidentiary Hr'g Tr. 34:3–21). Officer Moreno-Marquez instructed Officer Michaels to stop the car, and both officers approached Defendant. (Evidentiary Hr'g Tr. 19:13–20). Officer Michaels drew his weapon and verbally commanded Defendant to lay on the ground. (R&R 2:3–7). After

---

[1] Officer Moreno-Marquez testified that this is a high crime area based on his training and experience. (*See* Evidentiary Hr'g Tr. 14:4–24, ECF No. 57). Specifically, Officer Moreno-Marquez had "at least five years of experience working for LVMPD doing patrol and field training for the Downtown Command Unit." (R&R 12:6–9). Additionally, Officer Moreno-Marquez had "personal experience working as an officer in the neighborhood the informant described and in responding to incidents at the specific location reported." (*Id*. 12:9–12).

[2] Officer Moreno-Marquez would later describe the 911 caller's description of the suspects as "vague." (Evidentiary Hr'g Tr. 35:21, ECF No. 57). Officer Moreno-Marquez further explained that based on the call, he did not have any specific description regarding the suspect's height, weight, or clothing. (*Id*. 35:21–36:5). Officer Morey corroborated that the only identifying description given by the call was that the Black male adults were slim. (*Id*. 59:7–16).

apprehending Defendant, Officer Moreno-Marquez subsequently walked around the area to determine if other suspects had hidden or fled. (R&R 3:2–3); (Evidentiary Hr'g Tr. 23:1–11). Officer Moreno-Marquez then brought Defendant back down the alley to where Officer Kevin Rivera ("Officer Rivera") and Officer Morey had detained two additional suspects. (R&R 3:2–3).

Defendant, as well as the two additional suspects, disclosed that they were not from the area. (Evidentiary Hr'g Tr. 23:15–20). Defendant further stated that he "was on paper," meaning he was either on probation or parole. (Evidentiary Hr'g Tr. 24:1–4); (R&R 3:9–13). After researching Defendant's supervision conditions, Officer Moreno-Marquez arrested Defendant for violating his parole. (Evidentiary Hr'g Tr. 26:20–25); (R&R 3:12–14). Officer Moreno-Marquez then re-walked the alleyway where he observed Defendant fleeing to determine if Defendant abandoned any contraband.[3] As he was re-walking the alleyway, Officer Moreno-Marquez saw a firearm on the ground. (R&R 3:20–21); (Evidentiary Hr'g Tr. 28:10–16). Officer Moreno-Marquez thought it was "a fairly new firearm and appeared clean as if it had been discarded recently." (Evidentiary Hr'g Tr. 30:23–24). Upon retrieving the firearm, Officer Moreno-Marquez returned to Defendant and asked him whether the firearm was his. (R&R 4:3–5). Defendant unequivocally denied ownership of the firearm seven times. (*Id*. 4:7–9).

In his Motion to Suppress, Defendant asks the Court to exclude the firearm because the police lacked reasonable suspicion to conduct an investigatory detention, and that any relinquishment of the firearm was involuntary due to officers wrongfully engaging in said detention. (Mot. Suppress 2:22–7:9, ECF No. 46); (Obj. 10:6–27, ECF No. 64). Following an evidentiary hearing, the Magistrate Judge recommends that this Court find that the officers had

---

[3] Officer Moreno-Marquez explained that retracing the steps of a fleeing subject is his practice even when the suspect is not apprehended. (Evidentiary Hr'g Tr. 27:14–17).

reasonable suspicion to conduct an evidentiary stop, and that even if the officers lacked reasonable suspicion, Defendant voluntarily abandoned the firearm by discarding it before the officers stopped him. (R&R 6:5–12:2).  The Magistrate Judge thus recommends that the Court deny Defendant's Motion to Suppress because there is no underlying constitutional violation. (*Id*.).

## II.   LEGAL STANDARD

As an initial matter, Defendant's Objection cites to Local Rule IB 3-1(a) for the applicable legal standard. (Obj. 1:20–27).  Local Rule IB 3-1(a) provides, in relevant part, that "a district judge may reconsider any pretrial matter referred to a magistrate judge in a civil or criminal case under LR IB 1-3, when it has been shown the magistrate judge's order is clearly erroneous or contrary to law."  However, motions to suppress are not referred to a magistrate judge under Local Rule IB 3-1.  Instead, motions to suppress are referred under Local Rule IB 1-4(h).

Local Rule IB 3-2 in turn states that "any party may file specific written objections to the findings and recommendations of a magistrate judge made pursuant to Local Rule IB 1-4." 28 U.S.C. § 636(b)(1)(B); D. Nev. R. IB 3-2.  Upon the filing of such objections, the Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections are made. *Id*.  The Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1); D. Nev. IB 3-2(b).  Accordingly, the Court will conduct a *de novo* review of the portions of the Magistrate Judge's Report and Recommendation to which objections were made.

## III.   DISCUSSION

Defendant objects to the Magistrate Judge's Report and Recommendation on two grounds.  First, Defendant contends that Officer Moreno-Marquez and Officer Michaels lacked

///

reasonable suspicion to seize him in violation of the Fourth Amendment.[4] (Obj. 3:23–10:13). Because the officers lacked reasonable suspicion, Defendant thereby asserts that the gun obtained from the seizure must be suppressed. (*Id*. 11:1–18). Defendant then argues that he did not voluntarily abandon the gun because his denial of ownership was a direct result of officers' wrongful investigatory detention. (*Id*. 10:24–27). The Court first discusses whether Officer Moreno-Marquez and Officer Michaels had reasonable suspicion to detain Defendant and conduct an investigatory stop.

**A. Reasonable Suspicion**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search or seizure is presumed unreasonable unless it falls into a "specifically established and well-delineated exception[]." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)). For example, in *Terry v. Ohio*, the Supreme Court determined that a suspect on the street could be briefly detained and investigated without a warrant when an officer has "a reasonable suspicion of criminal activity based on 'specific and articulable facts and rational inferences from those facts.'" 392 U.S. 1, 19, 21 (1968); *Florida v. Royer*, 460 U.S. 491, 512 (1983). "[T]he Supreme Court has said

---

[4] In his Objection, Defendant also raises for the first time that his initial interaction with Officer Moreno-Marquez and Officer Michael was an arrest rather than an investigatory detention. (Obj. 3:23–28, 10:11–13). Indeed, the Magistrate Judge noted in the Report and Recommendation that "the evidence establishes" that the initial stop was an investigatory detention and "neither party submits that [Defendant] was arrested at the time of this interaction." (R&R 11:25–28). "The Court need not consider new arguments or evidence raised for the first time in objections to the Report and Recommendation." *United States v. Martin-Lara*, No. 3:20-cr-00080, 2021 WL 3418431, at *2 (D. Ala. Aug. 5, 2021) (citing *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000)). Therefore, the Court is within its discretion to decline to examine Defendant's new argument because he failed to properly raise it before the Magistrate Judge. Even if Defendant's objection was procedurally proper, however, Defendant provides no analysis in his Objection for why the initial interaction was an arrest rather than an investigatory stop. (*See generally* Obj.). Indeed, immediately after raising the argument, Defendant returns to his previous argument that "[t]he threshold question of whether the officers had reasonable suspicion to seize" Defendant "should be dispositive in the Court's analysis." (Obj. 5:22–24). Under either argument, the Court adopts the Magistrate Judge's conclusion that officers first conducted an investigatory stop before arresting Defendant for a violation of his parole.

repeatedly that [courts] must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Brown*, 996 F.3d 998, 1006 (9th Cir. 2021) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotation marks omitted).

In the Report and Recommendation, the Magistrate Judge identified three sources of information which formed the basis of Officer Moreno-Marquez and Officer Michaels' reasonable suspicion in conducting an investigatory stop: (1) the 911 caller's tip that a potential auto-burglary was in progress; (2) Officer Moreno-Marquez's determination that the neighborhood was a "high-crime" area based on his prior experience as a LVMPD officer; and (3) Defendant's flight from the alleged auto-burglary scene. (R&R 11:19–12:5).

1. Reliability of Informant's Tip

Defendant contends that the 911 call did not contain sufficient indicia of reliability to support a finding of reasonable suspicion. Specifically, Defendant contends that the "911 call[] utterly lacked detailed . . .[,] was not particularized[,] and did not report an emergency." (Mot. Suppress 6:8–12); (Obj. 9:3–7). In rebuttal, the Government asserts that the 911 call was sufficiently reliable because the caller provided dispatch with his identity and was watching the alleged auto-burglary unfold in real time through a live video camera stream. (Resp. Mot. Suppress 9:10–19, ECF No. 47); (Resp. Obj. 8:1–5, ECF No. 65).

"While a tip such as the 911 call may generate reasonable suspicion, it can only do so when, under the 'totality-of-the-circumstances,' it possesses two features." *United States v. Vandergroen*, 964 F.3d 876, 879 (9th Cir. 2020). "First, the tip must exhibit sufficient indicia of reliability, and second, it must provide information on potential illegal activity serious enough to justify a stop." *Id*. The Supreme Court and the Ninth Circuit have identified the following factors that can demonstrate the reliability of a tip: (1) "whether the tipper is known, rather than anonymous[;]" (2) "whether the tipper reveals the basis of his knowledge[;]"

(3) "whether the tipper provides detailed predictive information indicating insider knowledge[;] (4) "whether the caller uses a 911 number rather than a non-emergency tip line[;] and (5) "whether the tipster relays fresh, eyewitness knowledge, rather than stale, second-hand knowledge." *Id*. at 879–80.

Here, the 911 call bore many of the indicia of reliability laid out by the Ninth Circuit. First, the caller provided his name and telephone number. (Resp. Mot. Suppress 9:10–13); *see United States v. Nickalaskey*, No. 21-cr-30096, 2022 WL 729091, at *1 (9th Cir. Mar. 10, 2022) ("The call displayed significant indicia of reliability in part because the caller was not anonymous; instead, he provided his name and phone number to the police dispatcher."). In addition to providing his contact information, the 911 caller engaged in a discussion with officers at the scene, further enhancing his reliability. (Evidentiary Hr'g Tr. 36:9–12); *see Florida v. J.L.*, 529 U.S. 266, 270 (2000) (noting that a known informant is more reliable); *United States v. Rowland*, 464 F.3d 899, 908 (9th Cir. 2006) (observing that an informant's reliability was enhanced by the fact that he "made himself known to the DEA agents, and the agents met with the informant personally"). Second, the caller revealed the basis of his knowledge by explaining that he was watching the suspects live through his home video camera system. (Evidentiary Hr'g Tr. 36:13–24); (R&R 11:23–24); *see Vandergroen*, 964 F.3d at 880. Third, the fact that the caller was watching the suspects live in turn demonstrates that the caller was relying on fresh, rather than stale, knowledge. *See United States v. Terry-Crespo*, 356 F.3d 1170, 1177 (9th Cir. 2004) ("Police may ascribe greater reliability to a tip, . . . where an informant was reported what he had observed moments ago, not stale or second-hand information.") (internal quotation marks and citation omitted).

Despite these indicia of reliability, Defendant nevertheless contends that the caller's tip is unreliable because his physical description of the suspects was limited to describing them as thinly built Black males. (Obj. 6:19–9:7); (Mot. Suppress 2:53–9, 8–6:12). Defendant further

relies on Officer Moreno-Marquez's testimony in which he acknowledged that the 911 caller's physical description of the potential suspects "was vague." (Evidentiary Hr'g Tr. 35:21). The Court agrees with Defendant that the 911 caller's physical description of the suspects was not highly particularized; the Court disagrees, however, that the lack of physical description renders the call unreliable. Specifically, even though the 911 caller did not recount the precise physical characteristics of the suspects he did supply pertinent details about their location and activity. *See United States v. Sandoval*, No. 10-cr-02991, 2011 WL 3349155, at *6 (D. Ariz. May 19, 2011) ("Predictive information that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public and is more valuable if it relates to suspicious activities.") (citing *Rowland*, 464 F.3d at 907–08). Although the caller's vague description of the suspects presents far from an overwhelming case of reasonable suspicion, the Court finds that when viewed in connection with the other factors for determining reliability laid out by the Ninth Circuit, the 911 caller's tip was sufficiently reliable to support reasonable suspicion.

        2.       <u>High-Crime Neighborhood</u>

The Government contends that the neighborhood in which the crime occurred is a "high-crime" area. The Government based its conclusion on Officer Moreno-Marquez's training and his knowledge from his "personal experience that the [crime occurred] in a high-crime area where criminal street gangs sometimes operated." (Resp. Obj. 8:7–12); (R&R 12:6–14). Notably, Defendant does not dispute Officer Moreno-Marquez's contention that the alleged crime was committed in a high-crime area.

The Ninth Circuit has explained that "the citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000). "Any such designation must be properly

limited and factually based." *United States v. Howard*, No. 20-cr-00327, 2021 WL 879878, at *5 (N.D. Cal. Mar. 9, 2021) (citing *Montero-Camargo*, 208 F.3d at 1138. Courts must be particularly careful that the "high crime" area factor "is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity." *Montero-Camargo*, 208 F.3d at 1138.

Defendant does not contend that this is a "case in which the term 'high crime area' is being used to paint an entire neighborhood or community with a broad brush." *United States v. Cole*, 445 F. Supp. 3d 484, 489 (N.D. Cal. 2020) (citing *Montero-Camargo*, 208 F.3d at 1138). Nevertheless, there is a noticeable lack of factual evidence establishing the neighborhood as "high-crime." The sole evidence the Government offers to show that the neighborhood was "high-crime" is from the following exchange involving Officer Moreno-Marquez at the evidentiary hearing:

> Q. And based on your training and experience, is this a high-crime neighborhood?
> A. Yes, Sir.
> Q. Based on your training and experience, do criminal street gangs sometimes operate in this neighborhood.
> A. Yes. Sir.

(Evidentiary Hr'g Tr. 14:16–24).

In determining whether an area is "high-crime," district courts have relied on statistics, including the rate of arrest for particular crimes, to determine if the crime-rate in the relevant area occurred with unusual regularity. *See United States v. Conerly*, 75 F. Supp. 3d 1154, 1165 (N.D. Cal. 2014) ("Officer Lathrop's subjective impression of the character of the neighborhood is not supported by objective indicia of frequent criminal activity that one would expect to find in such an area."); *United States v. Cole*, 445 F. Supp. 3d 484, 489 (N.D. Cal. 2020) ("Rather, the government has introduced specific facts to demonstrate the high volume of gang and gun violence around Bookers Liquor Store . . . ."); *United States v. Nunn*, No. 14-cr-

00636, 2015 WL 3764181, at *7 (N.D. Cal. June 16, 2015) (examining the rates of arrests in the relevant area to determine if an area was truly "high-crime").

As stated, the sole evidence proffered by the Government in support of its argument is Officer Moreno-Marquez's testimony. It is true that "[p]olice officers who regularly patrol in a particular neighborhood may competently testify that [a] neighborhood is . . . 'high-crime.'" *Ingram v. City of Los Angeles*, 418 F. Supp. 2d 1182, 1192 n.6 (C.D. Cal. 2006); *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."). But the Ninth Circuit has also cautioned that "more than mere war stories are required to establish the existence of a high-crime area." *Montero-Camargo*, 208 F.3d at 1139 n.32. The Court is hard-pressed to categorize Officer Moreno-Marquez's aforementioned testimony as a war story. Nonetheless, the exchange encapsulates the sentiment warned of by the Ninth Circuit. The threshold for establishing an area as high crime seemingly requires more than one officer's subjective impression. *See Conerly*, 75 F. Supp. 3d at 1165; *United States v. Retta*, 156 F. Supp. 3d 1192, 1200 n.76 (D. Nev. 2015) (assuming that officer's characterization of an area as high-crime was correct, while observing that officers painted a neighborhood with a broad brush by relying on officer testimony that an area was high-crime crimes without offering evidence to corroborate the officers' impression).

In the absence of specific factual findings to bolster Officer Moreno-Marquez's classification that the area is "high-crime," the Court finds that his classification is entitled to reduced weight. *See United States v. Lafon*, 681 Fed. App'x 603, 605 (9th Cir. 2017) (determining that an officer's testimony that an area was high-crime was only entitled to minimal weight where there was "no actual information" underlying the designation proffered). Although his classification is given reduced weight, the Court nevertheless finds that Officer

Moreno-Marquez's opinion that the area was "high-crime" weighs in favor of finding reasonable suspicion.

### 3. Defendant's Flight from the Scene

Defendant contends that his flight from police officers is not a dispositive factor in establishing reasonable suspicion because innocent people, especially individuals of color like Defendant, have reason to flee from law enforcement. (Obj. 9:8–10:5); (Mot. Suppress 6:13–7:8). In rebuttal, the Government contends that unprovoked flight from police, when coupled with other circumstantial evidence, is sufficient to establish reasonable suspicion. (Resp. Obj. 7:10–8:12).

While flight from law enforcement officers is not necessarily indicative of a crime, it does give rise to some suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 125–25 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but is certainly suggestive of such."). Moreover, as the Ninth Circuit recognizes, flight is an "admittedly significant" factor in a reasonable suspicion analysis. *United States v. Brown*, 925 F.3d 1150, 1155 (9th Cir. 2019) (citing *Wardlow*, 528 U.S. at 124)); *United States v. Rodriguez*, No. 3:21-cr-002, 2021 WL 3932244, at *3 (D. Nev. Sept. 2, 2021) ("[A]s the Ninth Circuit recognizes, flight is an 'admittedly significant' factor in a reasonable suspicion analysis.") (citation omitted). "The relevance of flight depends on the circumstances; courts have recognized that innocent people might have reasons to flee, particularly depending on their race." *United States v. Alvarez*, No. 3:20-cr-00086, 2020 WL 4701179, at *7 (N.D. Cal. Aug. 13, 2020).

Defendant likens the instant action to the circumstances in *United States v. Brown*, 925F.3d 1150 (9th Cir. 2019), in arguing that his flight should not factor into, or at the very least be given reduced weight in, the Court's reasonable suspicion analysis. (Obj. 9:8–10:13). *Brown* involved a 911 call reporting to Seattle police that an unidentified person saw a young,

Black man with a gun. *Brown*, 925 F.3d at 1152.  An officer spotted Brown, who matched the description, and "drove behind him for several blocks before turning on his patrol lights and driving the wrong direction down a one-way street to follow Brown." *Id.* at 1152.  When the officer turned on his lights and began following Brown, Brown ran.  The Ninth Circuit held that a report of a gun did not even constitute reasonable suspicion as to Brown, taking note of the fact that Washington is a "shall issue state" and that there was no evidence that Brown was carrying without a notice. *Id*.  Thus, the police officer's decision to stop him rested entirely on his race and flight from officers, which the Ninth Circuit decided "was not enough under the circumstances" to constitute reasonable suspicion. *Id*. at 1152.

Based on *Brown*, Defendant is correct that his flight, on its own, would not warrant detention. *See Franklin v. Mally*, No. 17-cv-00789, 2019 WL 2548687, at *3 n.3 (N.D. Cal. June 20, 2019) ("The Ninth Circuit recently explained [in *Brown*,] why flight alone may not give rise to reasonable suspicion to support even an investigatory stop.").  But the facts must be considered in their totality, and *Brown* differs from this case in several key respects.  The Ninth Circuit began its analysis in *Brown* by noting that the police stopped Brown despite there being "no reliable tip, no reported criminal activity, no threat of harm, no suggestion that the area was known for high crime or narcotics, no command to stop, and no requirement to even speak with the police . . . ." *Brown*, 925 F.3d at 1151–52.  Here, "the 911 call was [] was both more reliable than the tip in *Brown* . . . and conveyed information about presumptively unlawful conduct." *Vandergroen*, 964 F.3d at 881.  Additionally, Defendant's flight in a suspected high-crime area,[5] which remains a significant factor, further militates in favor of finding reasonable suspicion.  Under the totality of the circumstances, the Court finds that officers had reasonable suspicion to detain Defendant for an investigatory stop.  Accordingly, because reasonable

---

[5] For the reasons set forth above, Officer Moreno-Marquez's determination that the area was "high-crime" is only afforded minimal weight.  Nevertheless, his determination still factors into the Court's reasonable suspicion calculus.

suspicion existed to detain Defendant, the officers' investigative stop did not violate the Fourth Amendment.

### B.  Abandonment

Defendant voluntarily abandoned the firearm by discarding it before the officers stopped him. (R&R 6:5–12:2).  Defendant unequivocally denied ownership of the firearm seven times. (*Id*. 4:7–9).  Defendant contends that he did not voluntarily abandon the firearm because he discarded the firearm in response to an unlawful investigatory stop. (Obj. 10:14–17).  However, because the Court has determined that officers had reasonable suspicion to conduct an investigatory search, the Court concludes that Defendant voluntarily abandoned the firearm.

## IV.   CONCLUSION

**IT IS HEREBY ORDERED** that the Report and Recommendation, (ECF No. 58), is **ADOPTED.**

**IT IS FURTHER ORDERED** that the Motion to Suppress, (ECF No. 46), is **DENIED**.

**DATED** this __14__ day of December, 2022.

_____
Gloria M. Navarro, District Judge
United States District Court